*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

HOWARD FRANK, Individually and on behalf
of all others similarly situated,

         *Plaintiffs*,

PLUMBERS & PIPEFITTERS NATIONAL
PENSION FUND; SEIU PENSION PLANS
MASTER TRUST; WEST VIRGINIA LABORERS
PENSION TRUST FUND,

      *Plaintiffs-Appellants*,

  *v.*

DANA CORPORATION,

        *Defendant,*

MICHAEL J. BURNS; ROBERT C. RICHTER,

      *Defendants-Appellees*.

No. 09-4233

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 05-07393—James G. Carr, District Judge.

Argued: January 21, 2011

Decided and Filed:  May 25, 2011

Before:  MARTIN and STRANCH, Circuit Judges; THAPAR, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  Joseph D. Daley, ROBBINS, GELLER, RUDMAN & DOWD, San Diego,
California, for Appellants. Joel W. Sternman, KATTEN MUCHIN ROSENMAN, LLP,
New York, New York, for Appellees.  **ON BRIEF:** Joseph David Daley, ROBBINS,

_____

[*] The Honorable Amul R. Thapar, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

GELLER, RUDMAN & DOWD, San Diego, California, for Appellants.  Joel W. Sternman, KATTEN MUCHIN ROSENMAN, New York, New York, for Appellees.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Circuit Judge.  This is a class-action securities fraud case reaching this Court for the second time.  Initially, Plaintiffs filed a consolidated complaint alleging that Michael Burns and Robert Richter, chief executive officer and chief financial officer respectively of Dana Corporation, violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (2009).  Plaintiffs claim that Burns and Richter made false statements regarding Dana's financial health in violation of section 10(b), and were controlling persons regarding false statements made by "Dana and other employees" in violation of section 20(a).  Defendants-appellees Burns and Richter filed a motion to dismiss pursuant to Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure and the heightened pleading standard of the Private Securities Litigation Reform Act of 1995.[1]  The district court granted the motion based upon this Court's rule in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001), which held that securities plaintiffs must plead a strong inference of scienter, meaning that scienter must be the *most* plausible inference that could be drawn from the facts.  Plaintiffs appealed that decision, and this Court remanded to the district court to apply the Supreme Court's then-recent decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), which held that a strong inference does not mean that scienter must be the most plausible inference, but rather *at least as* plausible as any other non-culpable inference.  Upon remand, Burns and Richter filed another motion to dismiss, which the district court granted by applying the rule from *Tellabs*.  Plaintiffs appeal.  For the following reasons, we **REVERSE** the district court's order granting dismissal.  Plaintiffs have adequately pleaded their section 10(b) and section 20(a) claims.

_____

[1]Having filed for bankruptcy, Dana is no longer a party to this litigation.

## I. BACKGROUND

A detailed explanation of the factual and procedural background in this matter can be found in this Court's earlier opinion in this case. *See Frank v. Dana Corp.*, 547 F.3d 564, 567-69 (6th Cir. 2008). Nevertheless, we summarize the pertinent facts and add a few not included in the previous opinion.

Burns was the chief executive officer and Richter the chief financial officer of Dana Corporation, an auto parts manufacturer. As part of their roles, during each fiscal quarter of the class period (April 21, 2004-October 7, 2005), they signed Dana's filings with the Securities and Exchange Commission, announced Dana's quarterly earnings through press releases and conference calls, and signed Dana's section 302 certificates in compliance with the Sarbanes-Oxley Act. Additionally, Burns and Richter assured investors that Dana used sound accounting controls. As all publicly traded companies do, Dana reported its actual and projected earnings per share for quarterly and annual periods. During the class period, both the actual and projected earnings reports were positive. In fact, many of the actual earnings were large improvements over earnings from the previous years. Dana announced that it was able to continue posting profits despite the rapidly increasing price of steel because it had achieved "cost efficiencies." Relatedly, Burns continuously made positive, optimistic remarks to investors about Dana's profitability and growth during the class period.

Even though Burns's and Richter's statements painted a publicly rosy picture, some divisions of Dana were wilting. Fifty percent of the company's drive shaft division was operating at a loss, and its light axle division was also suffering. Additionally, the price of steel, one of the company's biggest supply costs, jumped seventy-five to 120 percent in late 2004, but Burns and Richter demanded that each factory grow earnings by six percent.

Then, on September 15, 2005, Burns and Richter announced that Dana would be reducing its earnings projections by fifty percent because of the rising cost of steel, likely restating its financial statements for the second quarter of 2005, and possibly

writing down tax-deferred assets.  With this announcement, Dana's stock fell twenty percent that day and continued to decline thereafter.

On October 10, Burns and Richter announced that investors should no longer rely upon Dana's financial statements for 2004 and the first half of 2005, those statements would be restated, and Dana had discovered "material weaknesses" in its accounting systems.  With this announcement, Dana's stock fell thirty-five percent that day and continued to decline thereafter.

On December 30, Dana restated its earnings for the first two quarters of 2005, reducing net income by $44 million.  On January 17, 2006, Dana reported a $1.27 billion loss for the third quarter of 2005 and a reduction of its tax-deferred assets by $918 million through a "valuation allowance."

In February 2006, the Securities and Exchange Commission began a formal investigation into Dana's accounting methods.  Dana defaulted on millions of dollars of debt near that time before ultimately filing for bankruptcy on March 3, the same day that Richter retired.

## II.  DISMISSAL OF PLAINTIFFS' CLAIMS

Following our earlier remand in this case, the district court granted Burns and Richter's second motion to dismiss, again finding that Plaintiffs had failed to adequately plead scienter for their section 10(b) claim.  The district court also dismissed the section 20(a) claim, finding that Plaintiffs had failed to plead a requisite underlying claim and that they had failed to plead that Burns and Richter did not act in good faith.  On appeal, Plaintiffs argue that their claims were adequately pleaded to survive a motion to dismiss, and also that the district court improperly denied their request to file an amended complaint.

**A.      Standard of Review**

We review grants of Rule 12(b)(6) motions de novo.  *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009).  "To survive a motion to dismiss, [plaintiffs] must allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All facts in the complaint must be accepted as true.  *Courie*, 577 F.3d at 629 (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

**B.      Section 10(b) Claims**

"To state a securities fraud claim under Section 10(b), a plaintiff 'must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.'" *Frank*, 547 F.3d at 569 (quoting *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999)).  Regarding the scienter requirement, the Private Securities Litigation Reform Act requires that "plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"[2] *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th Cir. 2009) (citing 15 U.S.C. § 78u-4(b)(2)).  Scienter may take the form of "knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness."  *Id.* "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.  While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004) (quoting *Mansbach v. Prescott, Ball*

---

[2]In *Helwig*, 251 F.3d at 552, we enumerated a non-exhaustive list of factors that do not necessarily establish scienter, but are "usually relevant" to its analysis: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

& *Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)).  Recklessness is not negligence, but more "'akin to conscious disregard.'"  *Id.* (quoting *In re Comshare*, 183 F.3d at 550).

The Supreme Court recently explained three steps a court must follow when faced with a 12(b)(6) motion in a section 10(b) action.  *See Tellabs*, 551 U.S. at 322-324. First, all of the plaintiff's factual allegations must be accepted as true.  *Id.* at 322. Second, the complaint and other sources normally considered by a court when ruling on a 12(b)(6) motion must be considered in their entirety, including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Id.*  "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 322-23.  Third, "the court must take into account plausible opposing inferences" when determining whether there is a strong inference of scienter.  *Id.* at 323.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

**1.      Plaintiffs' allegations supporting an inference of scienter**

**i.      Internal reports**

Plaintiffs claim that Burns and Richter received internal reports and information showing that Dana was under financial distress, yet they continually made false, positive statements regarding Dana's financial health.  They allege that several internal reports and meetings should have informed Burns and Richter that their statements were false. First, they point to "tracker reports" that were compiled daily and weekly by accountants at each of Dana's factories and detailed sales, cost of materials, and inventory.  These reports showed that some of Dana's factories were not meeting their budgets. Additionally, in order to meet the required mark of six percent growth, some factory-level accountants falsified these tracker reports.  Next, these reports were consolidated into "production reports" every month and sent to various controllers at Dana

headquarters. Then, these production reports were the subject of weekly meetings conducted by Richter.

Second, Plaintiffs refer to financial and operational reports, which Richter helped prepare for monthly and annual meetings, listing total revenues, total inventory, total returns on sales, variances in forecasted versus actual income, and earnings growth.

Third, Plaintiffs claim that quarterly "SAD reports" showed the variances in the projected and actual performances of Dana's factories. These reports were also sent to controllers at headquarters, with whom Richter met regularly.

Fourth, Plaintiffs cite the failing drive shaft division, for which earnings were down fifty percent. Along with the rising cost of steel and fuel and other distressed product divisions, Plaintiffs assert that these conditions should have alerted Burns and Richter that their extremely positive earnings statements were incorrect.

Finally, Plaintiffs point to Burns's and Richter's positions as chief executive officer and chief financial officer respectively as evidence that they had access to accounting systems and internal information that were contrary to their positive external statements.

### ii.     Statements regarding accounting systems

Plaintiffs find fault with Burns's statements that he and Richter had evaluated Dana's accounting systems and found them to be sound, and that he and Richter were receiving direct reports of accounting information, when the accounting systems were actually functioning improperly.

### iii.     Magnitude of false statements

Plaintiffs argue that the size of Dana's false accounting statements adds to the inference of scienter when viewed with the other factors. Dana amended its financial statements to account for a loss of $44 million and eventually had to reduce its tax-deferred assets by $918 million. The company overstated its net income for the first quarter of 2004 by twelve percent, the second quarter of 2004 by ten percent, the fourth

quarter of 2004 by 3.6 percent, the first quarter of 2005 by 12.5 percent, and the second quarter of 2005 by seventy percent.

### iv.     Temporal proximity of Dana's positive and corrective statements

Plaintiffs claim that Burns and Richter were reckless in making their false statements because the statements were quickly followed by contrary company announcements.  Up until September 15, 2005, Burns's and Richter's statements regarding Dana and its financial performance had been positive.  On September 15, however, Burns and Richter announced that Dana would be reducing its earnings projections by fifty percent, likely restating its financial statements for the second quarter of 2005, and possibly writing down tax-deferred assets.  Other similarly negative announcements followed until March 3, 2006, when Dana filed for bankruptcy.

### v.     Motivation to earn bonuses and make Dana appear healthy

Plaintiffs claim that Burns and Richter were motivated by bonuses and job security to make Dana appear to be financially healthy when it was not.  More specifically, Plaintiffs claim that Burns and Richter stood to gain millions in bonuses that were directly tied to "reported" net income and earnings, and that Dana was able to use positive earnings projections to obtain loans imperative for its survival.

### vi.     Richter's retirement

Plaintiffs argue that Richter's retirement from Dana supports a strong inference of scienter because it occurred within months of the time that Dana first discovered its accounting errors and at the same time as Dana's bankruptcy filing.

### vii.    False Sarbanes-Oxley certifications

Plaintiffs argue that Burns and Richter signing Sarbanes-Oxley certifications that accompanied Dana's false financial filings supports a strong inference of scienter.

### viii.    SEC investigation of Dana's accounting practices

Plaintiffs claim that the investigation into Dana's accounting practices by the Securities and Exchange Commission supports a strong inference of scienter.

### 2.    The holistic approach to reviewing scienter pleadings

In the past, we have conducted our scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach. *Cf. Konkol*, 590 F.3d at 397-404; *Ley v. Visteon Corp.*, 543 F.3d 801, 809-14 (6th Cir. 2008); *PR Diamonds, Inc.*, 364 F.3d at 684. However, we decline to follow that approach in light of the Supreme Court's recent decision in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011). There, the Court provided for us a post-*Tellabs* example of how to consider scienter pleadings "holistically" in section 10(b) cases. *Id.* at 1323-25 (quoting *Tellabs*, 551 U.S. at 326) (internal quotation marks omitted). Writing for the Court, Justice Sotomayor expertly addressed the allegations collectively, did so quickly, and, importantly, did not parse out the allegations for individual analysis. *Id.* at 1324-25. This is the only appropriate approach following *Tellabs*'s mandate to review scienter pleadings based on the collective view of the facts, not the facts individually. *Tellabs*, 551 U.S. at 322-23 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency. Consequently, we will address the Plaintiffs' claims holistically.

**3.      Plaintiffs' allegations support an inference of scienter when viewed holistically**

It is uncontested that Burns and Richter made false statements, such as those concerning positive projected earnings, the soundness of Dana's accounting systems, and Dana's ability to continue to prosper in light of the rising cost of materials because of cost efficiencies. The question before us is whether Plaintiffs have adequately alleged that they made those statements with scienter so as to survive a motion to dismiss.

We conclude that Plaintiffs have adequately pleaded a strong inference of scienter when viewing the factors holistically. Burns and Richter ask us to infer that failed accounting systems are to blame here, and we find that inference plausible. However, the inference that Burns and Richter recklessly ignored the falsity of their external statements is at least as plausible as the faulty accounting inference. Burns and Richter were the top two executives of an auto parts manufacturer, and they reported gangbuster earnings during a period of time when the entire auto industry was spiraling toward bankruptcy. They filed these reports, made positive public statements, and asserted the veracity of their financials to government authorities all while one of their key product lines was operating at fifty percent of earnings, multiple factories failed to meet their budgets, and the price of steel rose seventy-five to 120 percent. It is difficult to grasp the thought that Burns and Richter really had no idea that Dana was on the road to bankruptcy. From the first public statement that Dana's earnings statements might be false, the company fell to its demise in a matter of nine months. Burns and Richter only appear more culpable when considering the loan obtained by Dana, which almost surely would have been denied if the company's true financial status was publicly reported, and the bonuses that Burns and Richter stood to earn.

Accordingly, the inference that Burns and Richter recklessly disregarded the falsity of their extremely optimistic statements is at least as compelling to us as their excuse of failed accounting systems. Plaintiffs have adequately pleaded a strong inference of scienter. *Cf. Matrixx Initiatives, Inc.*, 131 S. Ct. at 1324 (holding that plaintiffs alleged a strong inference when defendant issued a misleading press release

suggesting its over-the-counter pharmaceutical product did not cause anosmia, defendant had not tested its product for anosmia, there was insufficient scientific evidence at the time to determine whether it caused anosmia, and defendant had informed an independent scientist that it had hired a consultant to review the product out of concern over anosmia, asked that scientist to participate in animal studies, prohibited another scientist from using the product's name when he presented a study showing that the product caused anosmia, and organized a "a panel of physicians and scientists in response to [his] presentation"); *cf. also Miss. Pub. Emps.' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 79-80, 93 (1st Cir. 2008) (holding that plaintiffs alleged a strong inference of scienter when defendant withheld information about its medical stent product, defendant had reports from Europe and the United States that a defect in the stent caused medical problems in patients, defendant corrected the defect in a new model and built up a reserve inventory of the corrected product rather than releasing it, there was a close temporal proximity between the statements and the third recall of the defective products, and there was alleged insider trading before the recalls).

## C.    Section 20(a) "Controlling Person" Claim

Plaintiffs also claim that Burns and Richter acted as "controlling persons" in the section 10(b) violation, which would constitute a violation of section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a) (2006), which states that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Section 20(a) claims are predicated upon at least one underlying violation committed by a controlled party.  *See Ley*, 543 F.3d at 818; PR Diamonds, 364 F.3d at 696-97.

The district court dismissed Plaintiffs' section 20(a) claim against Burns and Richter for two reasons. First, the court found that Plaintiffs failed to "sufficiently plead a[n underlying] violation of securities law by Dana, its employees, or [Burns or Richter]" because they had failed to adequately plead scienter in their section 10(b) claim. Second, the district court found that Plaintiffs had failed to adequately plead that Burns and Richter did not act in good faith, a defense listed in section 78t(a). The district court's reasoning is faulty and Plaintiffs adequately pleaded their section 20(a) claim for the following reasons.

### 1.          Pleading an underlying violation

The district court concluded that Plaintiffs failed to plead an underlying violation because they had failed to plead scienter on the part of Burns, Richter, Dana, or other Dana employees as part of their section 10(b) claims. This conclusion cannot stand in light of our contrary determination above. Because Plaintiffs have adequately pleaded scienter as to Burns and Richter—Dana's chief executive officer and chief financial officer—they have also pleaded scienter as to Dana. *Cf. City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 688 (6th Cir. 2005) ("Ono's awareness of the claims as gleaned from these meetings is directly attributable to Bridgestone because 'knowledge of a corporate officer or agent acting within the scope of his authority is attributable to the corporation.'" (alterations and internal quotation marks omitted)); *cf. also Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010) ("Corporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them."); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) (citation omitted) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority."). If Burns and Richter acted with scienter in causing Dana to make false statements, then Dana had scienter with regard to those statements, too.

## 2.        Pleading the failure to act in good faith

The district court incorrectly required Plaintiffs to plead as part of their section 20(a) claim that Burns and Richter did not act in good faith.  Although we have never held that good faith is an affirmative defense that the defendant has the burden of establishing in a section 20(a) action, many of our sister circuits have.  *See Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008); *In re Stone & Webster, Inc., Sec. Litig.*, 424 F.3d 24, 26 (1st Cir. 2005); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 384 n.19 (5th Cir. 2004); *Dellastatious v. Williams*, 242 F.3d 191, 194 (4th Cir. 2001); *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 912 (7th Cir. 1994).  In addition, we have considered a good faith exception similar to that of section 20(a) in the context of a director liability suit.  In *McCall v. Scott*, 250 F.3d 997, 1000 & n.1 (6th Cir. 2001), we interpreted a provision of a Delaware corporation's Certificate of Incorporation that generally limited liability for directors of the corporation except "for acts or omissions not in good faith."  *Id.* at 1000.  We noted that "it is not the plaintiff who must establish bad faith at trial, but the defendant who bears the burden, however slight, to show good faith."  *Id.* at 1000 n.1 (citation omitted).  The rule from *McCall* applies here as well and we choose to follow suit with our sister circuits.  Good faith is an affirmative defense in section 20(a) claims and Plaintiffs were not required to plead that Burns and Richter acted without it.

## III.  PLAINTIFFS' MOTION TO AMEND

As part of their response to Burns and Richter's motion to dismiss, Plaintiffs informally requested leave from the district court to amend their complaint to include proposed testimony from confidential sources that would help establish Burns's and Richter's scienter, but they did not file a motion to amend pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.  The district court denied Plaintiffs' request, and Plaintiffs appealed that decision.  Because the amendments that Plaintiffs seek to make would purportedly strengthen their section 10(b) claims, and we have held here that the district court improperly dismissed those claims even without those amendments, we need not reach this issue.

## IV.  CONCLUSION

Having reviewed Plaintiffs' allegations holistically, we hold that Plaintiffs adequately pleaded a strong inference of scienter as part of their section 10(b) claims. Furthermore, they adequately pleaded their section 20(a) controlling person claim. Accordingly, we **REVERSE** the district court's order granting dismissal.